If it may please the Court, my name is Keith Kiyuchi. I represent Plaintiff Appellant Clayton Gohier. Mr. Gohier is a canoe captain who, after taking out some models on a photo shoot, came back in. There's a photograph taken when he comes back in on Waikiki Beach. It ends up on a tag. I think we know the fact. I have just a preliminary question. Are you here on tort causes of action or contract or quasi-contract causes of action? We're here on quasi-contract of action. The two claims that remain were Comps 1 and 4 of the original complaint. Comp 1 was a contract claim or quasi-contract claim. Comp 4 is an enrichment claim under Hawaii law. Those are the only remaining claims. The courts are all gone. Misappropriation, appropriation, those are all gone. Right. And as the Court knows, I was third counsel when I came in really on the eve of trial, such as life, but the discovery period was extended. But the only thing remaining, the only issue before the Court, are those two remaining claims. And Plaintiff filed motion for wrong in granting the motion for summary judgment on just those two claims. So what evidence did you provide the Court of your damages and under what theory? Well, the damages, the two claims are two separate but parallel claims. What are your two claims left? The two claims left are implied contract claim and an unjust repatriation claim. So what measure of damages did you argue? I know you argued for a percentage of profits, but what did you put before the Court as the basis for that? Well, our whole argument was that at that point in time, Mr. Gohier did not have the ability to take the additional discovery that would have really defined what those damages were. But suppose that theory isn't an appropriate theory under unjust enrichment for implied contracts. Suppose that your theory, your particular theory of damages that you wanted to pursue and take discovery on isn't supported by the law. Did you have any alternative measure that you offered to the District Court? The only alternative measure we would have had would have been the measure of what the models were paid on the photo shoot. And that was the difficulty with the entire case, is in the very beginning, if the Court would remember, there was a discovery order. And really, the plaintiff was precluded from getting certain essential information, even before I entered the case when his first counsel was in. And that was initially some of the argument made before the District Court, that where the plaintiff is prevented from obtaining evidence or key discovery on damages, then the defendant can't come back in and say, aha, you've improved damage. What is your measure of damages on your implied contract cause of action? It would have to be what a reasonable compensation would be, based on... For services? For services. And that would be what maybe some of the other people who are being paid, what's, hundreds of dollars? Well, see, the problem with that is that's like comparing apples with oranges, because those are models on a regular photo shoot. And part of the reason we wanted the discovery is because this is a unique situation. This is a guy that is not a professional model, but really that picture or his image defines that photograph. This is not something where you can just grab them like you can with a model on a photo shoot doll, make them look really nice, and then shoot the photo. This is a photo that occurs by... So what's your measure of damages? That's why we wanted the information. We wanted to know what Quicksilver would have compensated other people in a similar situation. What the value was to Quicksilver. That was the whole point in the argument before the meeting. A non-professional just off the street? A non-professional off the street, but keeping in mind that this was not a staged photograph. This was a photograph that happens because at that point in time, it's like a snapshot that occurs that we see like in Life or Time magazine, that snapshot that occurs that burns an image. Now, why is this snapshot, why is this photograph that burns an image so important to Quicksilver that they feature it as much as they do? What's your measure on unjust enrichment, the same thing? Unjust enrichment would have to be what the value was to Quicksilver of that photograph. In other words, if you look at what Quicksilver's marketing department did, how did they value that? Why did they use that particular photograph? What value did it have to them in their marketing? For example, you have like a national sandwich chain or a national fast food chain that uses a spokesman. What is the value of that? But what's the value of someone simply off the street like a jarred? What's the value? When we do unjust enrichment, I think you're accurately describing not only what I think Hawaii law is under the direct case, but the general principle of unjust enrichment measure of recovery, which is to say value to the person who's been unjustly enriched. That's right. But I've got a refined question on that point. Do we look at value as it now exists, as it has turned out to be? That is to say, it's now been put on tags, and apparently it's a very successful tag because they keep using it and so on. Or do we look at value after the picture has been taken? They've decided to put it on the tag because they think it's going to be very useful. The value that they would then put on it and would have been willing to pay had, in fact, Mr. Billiard come to them and said, OK, I want you to pay me totally what's worth to you. Those two may be two different measures. What they think it's worth as they're about to put it on the tag and what it's turned out to have been worth once they've used it on. I think in this case, I think it's what it turned out to be, because this is not a staged picture. This is a picture, if you go back to the old Vietnam photographs, like the young lady in Vietnam with the clothes off. But she compensated, and there was no right to compensation. I mean, time wasn't unjustly enriched. Time was important. I mean, I don't see that analogy at all. But if you took a photograph that you use for commercial purpose, time didn't necessarily use that for commercial. Actually, it did. It put it on the cover of its magazine. It probably sold a lot more magazines. But they used it as part of its reporting. What Quicksilver did here is they used it part of their commercial campaign. And the question becomes, how does that feel? This is commercial start to finish. That's right. There's no question about it. There's absolutely no question about that. But the reason that's a good question, because one of the cases that the defendant cites is the AmFab case on the question of foreseeability, because the district court judge said that the problem he had was the damages asserted by Mr. Goheer were not foreseeable at the time. But the AmFab case's foreseeability does not require an actual recognition of the time of the contracting of the specifics of the injury or the damages that follow. In other words, it could be, as you've posited, that the situation would be completely different. It could evolve where Mr. Goheer's value actually increases because the value becomes something of importance to Quicksilver. See, that's the whole purpose of unjust enrichment. That's the way I see it. Or I would argue to the court is that Quicksilver got the benefit. They were unjustly enriched by the value of his services. It's like the picture says a thousand words. In this case, the picture says a thousand words for the image that Quicksilver wants to convey. You could not stage that picture. That's the whole point. This is not similar to $600 a day on a model. This is something that occurs. This man is there. It seems like the theory that you're arguing is more appropriate for some of the tort and misappropriation and right of publicity, all of that, all those causes of action that were dismissed. They could be, but the way Hawaii law works under Small v. Bain and Hopp and Durant, it's a very elastic concept, as the Hawaii Supreme Court has pointed out. The whole idea with the unjust enrichment under Hawaii law is to appropriately compensate a party for the services or the benefit that's been conferred. Services or the benefit? The benefit that's been conferred upon Quicksilver. Which is the leading case? Which is the last case you would like us to read? The direct case. The direct case is very specific. If you look on page 504, it has a specific definition in the direct case about what the difference is between implied contract and unjust enrichment. It says, claim for unjust enrichment only requires that plaintiff prove that he or she conferred a benefit upon the opposing party and the retention of that benefit would be unjust. That's the whole point that we're arguing here. I agree with you that maybe some of those claims definitely go within the tort atmosphere, but the whole idea is that this is such an elastic concept that some of the items that we're talking about, some of the benefits that we're talking about that were conferred, fall within the Hawaii law on unjust enrichment. That's really what the basis for our argument is that in this context, on the motion for summary judgment, the district court judge erred when it did not look at the elasticity of the unjust enrichment concept and the whole concept of this photograph. What he concentrated on was really an error in the record where he said that Mr. Gohier got this clothing, which was really an issue of material fact, and that's one of the primary holdings in his ruling. I would like to reserve some time. Thank you. Good morning, Your Honor. Ben Blakely for Quixel Corporation. Your Honor, the problem with counsel's argument just then, as Judge Warloff pointed out, is that is a right to publicity argument where you've got a situation where either under the California Civil Code 3344 or even under the Lanham Act where you've got statutes that specifically set forth, all right, there's a disgorgement of profits available to litigants under those tort claims. But we're very familiar with various causes of action that overlap either in terms of what's necessary for liability but also a measure of damages. And it's very clear to me that unjust enrichment looks at benefit to the defendant just as an invasion of the right of privacy in the commercial sense would do the same thing. Really to say that the right of privacy might provide a parallel recovery is not to say that you don't get an unjust enrichment theory as well. And I understand that, Your Honor, but the problem with the unjust enrichment theory, which is the problem really with all their claims, is that, as Judge King pointed out, Gohier provided absolutely no evidence whatsoever that profits was within the contemplation of the parties. It doesn't have to be. I believe under the law it does, Your Honor. No, as I read unjust enrichment law, both generally under the restatement and the cases around the country and under direct, unjust enrichment looks at the benefit provided to the defendant, contemplation of the parties, that's consequential damages under contract law. That's not unjust enrichment law. Your Honor, I respectfully disagree. I think the Hawaii law and this Court's law, in the cases I cited in the brief, Hildreth v. Waksberg, the NYSERC decision, and Walby-Fock, the Hawaii case, and several other cases recited therein, talk about the dissimilarities between an implied in fact contract or an unjust enrichment claim based upon an implied in fact contract or based upon an implied of law or, as they call it, a constructive agreement. Under an implied in fact agreement, which would be the theory that they're arguing in this case, is where there's clearly an indication that a party gave services which were accepted so that there was an intent to enter into an agreement for services. And then you look at what was contemplated by the parties, what was normally in the custom, in practice, of compensation. In other words, you got a lost income claim. What would someone similarly situated in? But that's not this case. That is this case, Your Honor. In this case, he entered into no contract whatsoever with respect to that picture. He entered into a contract that he was going to provide them canoe services. They then take his picture, and they then use the picture for their own benefit without ever entering into any contract with him. Again, Your Honor, I respectfully disagree. On the facts. Their complaint. Am I misdescribing the facts, or are we disagreeing on theory? You're misdescribing the facts, Your Honor. Okay, let's get to the, what are your, what's your version? The facts are, first, they allege in the complaint that we had a contract. We entered into a contract with Quicksilver. And in our answer, we said, yeah, we did. We entered into a contract. There was a contract between ourselves and GoHear. We're saying the contract was for clothing, and he was provided with clothing. I see, you're saying the t-shirt was payment? Right, as if you look at the model releases from the actual professional. And if we were to hold that that was not a contract, that that was freebie goods. I have to say, I'm fairly familiar with the sort of activity where a company like Quicksilver, for very good and perfectly appropriate commercial reasons, likes people who are in positions like Mr. GoHear to wear their material. I mean, he could have charged you to wear that t-shirt, and you might have paid him. Your Honor, the, well, first thing, they pay, Quicksilver pays a lot of people to wear their clothing. They sponsor a lot of professional services. So I have to say that giving him a t-shirt in terms of, okay, we're going to compensate you for taking this picture, here's your t-shirt, I have to say I'm not convinced by that one. Well, if you look at a lot of the model releases, which talk about the compensation for many of the models on this photo shoot, a lot of them just received clothing, and at most, and these are well-known models, people that have appeared in films and are professional surfers, at most, a model on this photo shoot was getting $600 a day, Your Honor. Do you think, I'm just, right, so that would be, do you concede or admit that Mr. GoHear did provide some service to you? Yes, Your Honor. All right, so then the, I think the logical consequence of that would be that, setting aside the clothing, that under the theory of unjust enrichment, some value might be attributable to that service that Quicksilver benefited from. And I think what we're struggling with is what is the value of that service? I mean, GoHear says that he's not just any model, he's the real thing. So he should be entitled to more. And I'm just, you know, maybe that's not necessarily something that comes up in discovery under Rule 56F, maybe that's something he should have established with an expert witness or something, the value of his particular services. And Your Honor, where they run into a dead end on that argument, say that it's a t-shirt, say that it's $600, say that it's $10,000, whatever it is, the value is what's the lost income? That's what we're talking about in this type of claim and to get affected. You're telling me that the measure of unjust enrichment is lost income to Mr. GoHear? Yes, Your Honor, under an implied, in fact, unjust enrichment. As an implied contract, maybe it would be, I mean, if there was an implied contract, what would be the value? Well, it's negotiated. And Judge King understood that. And there was absolutely no evidence whatsoever presented by the other side that this was something that would have been contemplated or negotiated by either party. Absolutely, there's no evidence whatsoever. For unjust enrichment, it does not need to be negotiated or contemplated. All it needs to be is a benefit provided to the other side. Under a implied in law or constructive situation, but this is an implied in fact situation. And there's also problems, they stipulated that there was no lost income claim. Yeah, let me, can I ask you a question about that? Twenty-six of your brief, you say, since, probably meaning because, GoHear stipulated that he was not seeking damages based on a loss of income, slash, reasonable value approach. He cannot prove damages for his unjust enrichment claim. What do you mean there, he stipulated? They stipulated, they stipulated on the record, they stipulated on the record during discovery when I started asking Mr. GoHear during his deposition about that issue. And also, to what did they stipulate? Mr. Lotsoff, prior counsel, and it's in the facts of the brief, stated that. Where is it in the record in front of us? The supplemental excerpts of record 101, and it's on page 11 of the brief, quoted in the footnote. On the footnote, okay. And it's also on the acknowledgement. Hang on, hang on, I'm looking for this one, page, SCR 101. In the supplemental excerpts of record, but it's cited in page 11 of the brief. No, I'm on the record, I'm on page, I'm on SCR 101, where do I look? We've asked you for, maybe not specifically the calendar, but documents relating to your damages and your income. And I would ask you one, Mr. Lotsoff, no, no, that's wrong. There's no claim for lost income. And I don't ever receiving a request for evidence of his income. It's not being claimed that there's a lost income claim. All right, I'll stipulate to that. That's what you mean. And you agreed, okay. And that's acknowledged in the Pellon's brief as well, Your Honor. But this is an unjust enrichment claim, it's not a claim for lost income. Your Honor, as the cases clearly indicate under Hawaii law and Ninth Circuit law, that under an implied effect contract, which is this case. Why do you keep saying implied contract instead of unjust enrichment? Because there are several types of unjust enrichment claims, Your Honor. You can get unjust enrichment with an implied of loss situation. And you can get unjust enrichment because under the circumstances of the case, the enrichment obtained by the defendant was unjust, period. It does not have to be a contract claim, it does not have to be a quasi-contract claim. It merely need be unjust enrichment. And what you're talking about, Your Honor, is a situation where there's been no attempt to enter into a contract, no situation where you've got someone who has done services, someone who's accepted services, and it's understood that there are services being done. You're talking about a situation like a case that I argued in front of your mother, the Abercrombie case, Downing v. Abercrombie & Fitch. How'd you do? Where I won. Or a case that I argued in front of Judge Wardlaw with Noah Johnson, another right to publicity case, which we also won. Two out of three ain't bad. And Judge Fletcher is speaking for himself. Yeah, I should be clear on the record, I'm teasing on that point. No, I understand, Your Honor. But what I'm saying is, what you're talking about is a situation where you've got a company like Abercrombie who basically took someone's photograph without their knowledge, I mean, just basically took their photograph, shoved it in a commercial advertisement, essentially, and used it without their permission. In this situation, you've clearly got them alleging a contract. You've got Quicksilver saying, yeah, we did have a contract with this guy. And we're disputing what the dispute was. Well, was it a t-shirt, or was it some sort of negotiated amount? I work in Hawaii, and all I got was this lousy t-shirt. Let me go back to page 26. The reason I ask you that question is because you say in your brief on page 26 that he stipulated he was not seeking damages based on loss of income, slash, reasonable value approach. But you look at the SCR, and there's nothing about reasonable value. It's just lost income. Well, the lost income... I don't see how you can say that he's stipulating that he's not after reasonable value when on the page before you say all he's entitled to is damages in the form of reasonable value of his services. Because the case law, the lost income cases, when they talk about, all right, how are we going to calculate this, is under the implied effect contract. What is the reasonable value? What is the reasonable value of those services? Do you know reasonable value can be nothing except lost income? Well, no. That's how you calculate what the lost income is. What would be... In other words, if you've got an implied effect... Well, first thing, Your Honor, in this case, we've got a contract. So they can't have an unjust enrichment claim and an express contract. They've alleged a contract. We agree there was a contract. So really, as a matter of law, and Judge King also ruled on this, there's no unjust enrichment claim anyway. Because there's a contract here. There's no dispute that there's a contract. Unjust enrichment comes in to fill in the gaps when, you know, when there's been no contract entered. In this situation, and that would actually bar a publicity claim as well, obviously. So in this situation, you've got a contract. So really, the dispute is over what is the reasonable value of the services? Well, in this case, they've stated, well, we're not... We just want profits. We're not looking for lost income claims. We're looking for Quicksilver's profits under a tort theory. And that's why Mr. Lotsoff bailed from the case after those theories got thrown out. Because the case was gutted at that point. He had stipulated... So you trapped him when he said, we have a contract. You said, you bet we do. We're not going to walk away from the fact that our photographer said, hey, can we use your picture? We'll give you clothes for it. Wait a minute. Where's in the record that your photographer said exactly that? I know that they never took any other depositions besides... I asked you, where is it in the record that your photographer said exactly what you just said he said? Because I don't think your photographer said that. It was... Here. It might have been Randy Hill, the senior VP that was familiar with it, or... Give me a second, Your Honor. Or Glenn Moncada. Page four of your brief, you say that's the case. Quicksilver's photographer asked Gautier if he could pose. Gautier was offered and agreed to accept clothing. Yeah, I think that, excuse me, that evidence comes in from Glenn Moncada. Excuse me. Quicksilver's sales representative here in Hawaii, as well as Tony Hill, their senior VP of sales. And that was the understanding that he was going to... Basically, from what I understood happened. And again, this photograph occurred in 1997. And part of the problem here is that they didn't file a lawsuit until four years later. And so I'm going down to Quicksilver and finding out what's going on, you know, five years after the fact, really. Glenn Moncada said that Gautier's girlfriend called up and said he was promised a pair of shorts and never got them. Right. So then he got them. And he admits that they gave me a T-shirt, which they brought down maybe a week later. Correct. But I didn't see anything in the record that a photographer said. I entered into a contract with him wherein he agreed to accept clothing in return for it. It's my understanding that, basically, it was like, look, you want to take a picture, we'll use it, we'll give you some shorts. And they alleged that. I don't want to hear, it's my understanding. If you've got it in the record, I want to read it. Your Honor, I think the only evidence we have on that topic, because, again, we don't even know who the, you know, who this, their only evidence is that someone purportedly said, oh, this is going to make you rich. And we don't even know who that person is. They don't even need that for unjust enrichment. All they need is that they took the picture, and without his authorization, they use it, and there's unjust enrichment coming out of it. That actually raises another interesting point. You basically got Judge King sitting here as a court of equity who's ultimately deciding the unjust enrichment claim, who's given a wide range of discretion on how he does that. And he dismissed the claim, and he held there was no evidence of damages in connection with that claim. But as I read what Judge King wrote, he was looking at damages in the old-fashioned, literal, clean sense of damages, rather than the sense of benefit to the defendant. Well, he tossed that claim for a number of reasons.  Excuse me. You can't have the, you cannot have a contract claim exist at the same time as an unjust enrichment claim, because an unjust enrichment claim comes in as where there's no express contract or. You can clearly have them as alternative claims. Right. But at the end of the day, you can only have one or the other. Well, it looks like we're left with just one. The contract claim. The contract claim's been tossed. We're talking unjust enrichment. Well, no, the contract claim has not been tossed. What happened was, in the sense of, the contract claim has not been tossed in the sense of, oh, there was never any contract. What happened was that they stipulated that there was no damages stemming from that contract, no, or really from an implied effect on an unjust enrichment claim, because their lost income is. I want to make sure I, where's the stipulation that you're relying on? The stipulation was entered into the record. It's acknowledged in the Cullen's brief. And also, there was absolutely no evidence on the record whatsoever that, of any damages other than this, under this, except for this disgorgement of profits theory, which is a theory that you only really get under either, well, Your Honor, under a right to publicity land in that kind of situation. Or. You know, I've got another problem with this case. And of course, you're, I suspect on this one I'm pushing on an open door. We shouldn't be here. I mean, this would have been so readily resolved once Quicksilver sees that this is really a good picture. They're going to use it. They come down to Mr. Gohere, and they say, you know, this is a terrific picture. We pay the model $600 a day. We recognize that we paid you for your canoe services, but we'd now like to use this picture. Would you accept $5,000? And the game's over. You're not here. We're not here. Everything's taken care of. Everybody's happy. But what happened, Your Honor, is what I suspect happened is that after the Downing case, which got a lot of press in Hawaii, came down, Charles Lotsoff got a hold of Mr. Gohere, told him he was going to make a lot of money on this case. That's why they were demanding $8 million from Quicksilver to settle the case. That was the demand, $8 million? Yes, Your Honor. How did the Downing case open up this possibility? Well, Your Honor, this occurred in 1997. The Downing case started in around 1999, received a lot of press. We were up and down in front of the Ninth Circuit a couple times in that case until it was finally resolved. And there was a lot of press on the case throughout it, particularly on the islands here and the advertiser. And so I think that Mr. Gohere, seeing that, you know, George Downing and Buffalo Kelowna and Beniva, these people who, you know, literally make millions endorsing their own lines and other products. Well, Mr. Gohere, who really just happened to be there that day, makes at most $60 a day, figured he hit the jackpot. Or at least his attorney convinced him of that. And they sued. And we tried and tried and tried to settle this case. My understanding now is counsel can't even find his client right now. And we thought I had a settlement in place before we even got to it. I've been trying to get this case over with. You mean settlement negotiations are still going on? Well, we can't find Mr. Gohere, Your Honor. What's the offer on the table? The offer on the table was with, well, when we prevailed on the right publicity claims, we're entitled to our attorney fees in the case. The offer on the table was that we would basically waive our fees against him, which were, I think, a word of like $30,000 or something like that. Assign his claims against his counsel, whatever. And if we ever collected anything, he'd get a portion of that. Basically be waiving our attorney fees against him. Oh, so you're saying we'll give you zero in return for a waiver of our claim against you? That's your offer on the table? Do you have a claim or an award? We have an award. An award, I'm sorry. We have an award of like... An award, so he owes you $30,000. So your offer of settlement is we'll waive the $30,000? Essentially, Your Honor. We'll all go away happy. Well, not happy. I mean, we spent a lot of money on a case that... You could have avoided by going down to the beach a little while later and saying, here's $5,000. Well, the first thing we found out about it, we got sued. And the demand was $8 million. Well, it depends on who we is. I mean, your company, your client, knew a long time ago that they were going to use this tag. I mean, the first thing they found out about it was they took the picture. They liked the picture. They decided to use the picture, and they got no release. And they had a deal in place. Yes, they got no release. And believe me, there have been discussions about that. And if they'd come to you at that stage, you would have advised them, you know, go on down to the beach and give them $5,000. It'll save you a lot of money and agony. But by the time it got on our plate, the number was $8 million. And so here we are. Okay. Well, you're over your time, and I don't think we're being a dead horse.  If it may please the court, I don't know how appropriate it is because the settlement negotiations are obviously not a record. But the demand may have been that on previous counsel. That's not where we were when the motion was filed. We were at $10,000. Well, can you find your client? Yeah. If I have to, I'll find my client, and the $10,000 will make him happy. He's a canoe captain that lives a little bit of a nomadic life. He was frankly brought to me through a Hawaiian activist that believed that he should get justly compensated for his services. It's not at $8 million. It's not at $4 million. The less settlement demand was at $10,000, which Quicksilver wouldn't meet. What about this award of attorney's fees? The award of attorney's fees was based upon the summary judgment being granted, but this isn't a plaintiff. This is essentially judgment-proof. So it's like saying, well, I'll forget this against you, and you get nothing, which is exactly what the problem is. It wasn't too palatable. They're not going to get anything anyway. He's judgment-proof. But if we were to agree with you, send this back for a trial, and somebody awards you $20,000, it's wiped out by the $30,000, and you still owe $10,000? Is that how it's going to work? The $30,000 was awarded because we lost on the motion for summary judgment. And that's not under appeal. So even if you win $20,000, you don't get anything. Well, the motion for summary judgment, which had the fees awarded, is the one that we appealed. So that's the one in front of us? That's right. That's the one in front. In fact, there was a previous order because Mr. Goheer and his previous counsel prevailed on a discovery issue, and attorney's fees were awarded to Mr. Goheer on that, which haven't been collected. That was appealed to the Ninth Circuit by Quicksilver and abandoned. But as far as the present award of attorney's fees, that solely relates to Judge King's granting of the motion for summary judgment. But, Chair, I think Judge Trott, and he can correct me if I'm wrong, I think his point is your client actually would be better served not by getting this remanded and trying the issue of the value of the services, which I happen to think is the appropriate value for services as opposed to other forms of unjust enrichment. But then he might end up having that offset. Whereas if you settle now before something happens and you go back, then maybe they realize his judgment improved and you can get your client some money. Well, and at this point, I think Mr. Goheer would simply accept some money. I mean, it took him a while to even accept the $10,000, but realistically, that's where he was before the motion for summary judgment was filed. That's where he still is. The last time I talked to him, that's probably where he still would remain. Do you want us to defer submission of this so that you can maybe work out something before we roll? I would be happy to do that with Quicksilver. I was not even able to get the $10,000 back on the table. I am frankly doing the case for Mr. Goheer pro bono for a whole lot of different reasons. But if that money comes back on the table, the case resolves itself, which it should have in the beginning. I view the case a little bit differently than previous counsel did. I view the case with some reality, but at the same time, I don't view it as a case that's compensated by a free t-shirt. The other side said, you don't even get to unjust enrichment because what you had was a contract. That's what you alleged. I disagree because Mr. Lotsoff alleged a contract. Quicksilver says, aha, I got you. You got a contract. But what were the terms? Because from the plaintiff's perspective, the compensation on that is not what Quicksilver was willing to pay. You have actually a material issue, a genuine fact issue. That's right. Right, I realize that. I will speak for myself. I think your client is entitled to some value for something, and it may be greater than the model. That's right. So, I mean, that is where I am. I think, I don't know where everybody else is, but you can judge for yourself, which I expect is from this question. So maybe it would be beneficial for you two to try to sell the case before we actually submit it and make a decision. I would be more than happy to do that. If I have to have certain people literally look like, look on my speech from my client, I can do that. And counsel? I mean, obviously, I'd like to talk to counsel. We've been trying to settle this case. We have a lot of fees in this case now to come here to write these briefs. I mean, I'm going to have a lot more if we send it back for a trial. I mean, that's just the reality of it. I mean, yes, I mean, if you don't mind deferring it for a short period of time, this case can go on for four years now, I think. Ten days? Ten days. Ten days would be fine. I'm not concerned. We're kind of doing this freelance at the moment. We do have a mediation unit that may or may not be able to help. We initially put this in mediation, which is why the briefing took so long. And part of the problem was we weren't able to get the $10,000 back on the table in mediation. Quite frankly, that's where we were at the time my client had agreed to take the $10,000 That's been consistent. That's not on the table. So you don't want to go back to mediation? You think they perhaps worked something out? Mr. Blakely and I have been able to communicate very well. That hasn't been a problem. There's no animosity at all. A mediator, I would certainly welcome any help that the Ninth Circuit would give. What about to mediation? Your Honor, I think, I mean, I think we understand, you know, we get it. I think we just try to work it out. Okay, we will defer submission for 14 days. And then you provide us a status report for the 14 days of his stay and let us know what you think. If you need more time, let us know that. If you've got it resolved, let us know that. All right? I will do that by way of the Ninth Circuit. All right. Thank you very much.
judges: Trott Wardlaw W. Fletcher